Karie N. Wilson
Nevada Bar No. 7957
MESSNER REEVES LLP
8945 W. Russell Road, Ste. 300
Las Vegas, NV 89148
Tel: (702) 363-5100
kwilson@messner.com

Attorney for Applicant Nagravision SA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| In re Application of NAGRAVISION SA, | Case No. _____ |
|---|---|
| Applicant. | DECLARATION OF PASCAL METRAL |

I, Pascal Metral, declare as follows:

1. I make this declaration based on my personal knowledge and, if called on to testify, would testify competently as stated herein.

2. I am employed as Vice President, Legal Affairs and Head of Anti-Piracy Litigation and Intelligence Operations, with Applicant Nagravision SA ("Nagravision"). My responsibilities include managing and directing Nagravision's anti-piracy investigations and support of legal actions worldwide, including the application for discovery filed in this case.

**Nagravision's Security Technology**

3. Nagravision is part of the Kudelski Group, a world leader in security and convergent media solutions for the delivery of digital and interactive content. Several leading broadcasters in the pay-television industry use Nagravision's security technology to ensure secure access to their subscription-based television services. Nagravision's customers serve markets globally, including Canal+ in France, DISH Network in the United States, and other major pay-television broadcasters in North America, South America, Europe, and Asia.

1

4.      Pay-television broadcasters that use Nagravision's technology transmit their signal to subscribers in encrypted form. To receive the signal, subscribers are required to purchase or lease from the broadcaster a receiver paired with a smart card and a programming subscription package. Viewing rights vary based on the services the subscriber purchased from the broadcaster.

5.      Nagravision designs and licenses software incorporated in the receivers and smart cards and manufactures smart cards. The smart card is used to (i) manage, store, and communicate to the receiver the subscriber's right to decrypt specific channels based on his subscription plan, and (ii) decrypt the encrypted control words or "keys" necessary to unlock and view the channels for which the subscriber has purchased access.

6.      Nagravision's control words are transmitted to subscribers in the encrypted audio and video streams of the pay-television broadcaster. Control words are channel specific and change approximately every five to forty-five seconds for each channel. Control words are double protected by being delivered in encrypted packets known as "entitlement control messages" or "ECMs." The keys used to decrypt ECMs, called "transmission keys," are stored in the memory of the subscriber's smart card and may be changed by the broadcaster over the air as needed.

7.      When a subscriber wants to watch a specific channel, the receiver obtains the ECM containing the encrypted control word from the satellite stream and forwards the control word to the smart card. The smart card uses its current transmission key to decrypt the ECM. The smart card then checks its rights database to confirm the subscriber has a subscription to view the programming the control word will decrypt. Provided the rights match, the smart card forwards the unencrypted control word to the receiver, where the control word decrypts the pay-television broadcast. In this way, Nagravision's security technology plays a vital role in ensuring its customers' programming is made accessible only to authorized subscribers that have purchased the right to view the content.

**The Sharktech Server**

8.      "Internet key sharing" or "IKS" is a method of piracy that involves the unauthorized harvesting and distribution of Nagravision's proprietary control words. Nagravision's control words are obtained by purchasing a subscription with a pay-television broadcaster and then using a genuine smart card activated on that subscription account to decrypt ECMs that contain the control words.

Once decrypted, the control words are sent from the smart card to a computer server, called an "IKS server," where they are saved in the server's memory or cache.

9. Nagravision's control words are distributed from the IKS server to end users. End users access the IKS server with an unauthorized receiver connected to the internet. When the end user tunes to a pay-television channel, the unauthorized receiver requests the control word for that channel from the IKS server. The IKS server sends the control word to the unauthorized receiver, thereby enabling the end user to decrypt the channel without having authorization from and without making payment to the pay-television broadcaster.

10. Nagravision identified an IKS server having the IP address 174.128.238.42. The IP address is allocated to Sharktech, Inc. ("Sharktech"), as shown in the Whois record that is attached as Exhibit 1. Sharktech is located at 8560 S. Eastern Ave., Suite 210, Las Vegas, Nevada, 89123, as shown in the printout from Sharktech's website attached as Exhibit 2. The same address is listed for Sharktech's officers and director with the Nevada Secretary of State, as shown in Exhibit 3.

11. Nagravision identified the IKS server using Sharktech's IP address 174.128.238.42 (the "Sharktech Server") through IP tracing, whereby Nagravision connected unauthorized receivers to the IKS service and using a network analysis tool was able to identify the IP addresses of servers accessed by the unauthorized receivers to obtain Nagravision's control words. The control words supplied by the Sharktech Server enable end users to circumvent Nagravision's security technology and receive without authorization the subscription-based television programming of Nagravision's customer in France, Canal+. Nagravision observed the Sharktech Server being used in this manner as recent as November 25, 2025, as shown in the network traffic log attached as Exhibit 4.

**Nagravision's Discovery Requests**

12. Nagravision invested significant resources to prepare the expert analysis tracing the unauthorized sharing of its control words to the Sharktech Server. Nagravision consulted counsel in France and intends to pursue a legal action against the customer responsible for the Sharktech Server in the Paris Judicial Court. Sharktech will not be made a party to that proceeding. The French court is identified as an appropriate forum because the control words distributed from the Sharktech Server are specific to Nagravision's customer that broadcasts its programming in France, thereby causing

Nagravision to reasonably believe the IKS service operators are extracting the control words from its customer's broadcasts in France and those control words are primarily being used to circumvent Nagravision's security technology by end users in France.

13.    French law has prohibitions similar to those in the Digital Millennium Copyright Act, 17 U.S.C. § 1201, and Federal Communications Act, 47 U.S.C. § 605. Title VI of France's Léotard Law, Articles 79-1 to 79-3, make it unlawful to receive television programs without authorization or manufacture, sell, rent, or advertise any device or equipment that is designed to fraudulently capture television programs without authorization. In addition, Article 4 of the Directive 98/84/EC of the European Parliament and of the Council of 20 November 1998 on the Legal Protection of Services Based on, or Consisting of, Conditional Access, prohibits the manufacture, distribution, possession, installation, or maintenance for commercial purposes of any equipment or software that is designed or adapted to give unauthorized access to a protected service. Nagravision intends to pursue claims against the customer responsible for the Sharktech Server for violations of these laws.

14.    Nagravision is not aware of the identity or the precise whereabouts of the Sharktech customer. Nagravision seeks permission to serve a subpoena on Sharktech for information that will assist in identifying the Sharktech customer so they can be identified by name and served in the legal action that Nagravision intends to file against the Sharktech customer. Nagravision obtained nearly identical discovery from Sharktech in two previous cases that it used to identify infringers and name them as defendants in cases filed in the United States. Nagravision was authorized to obtain similar discovery from server hosts like Sharktech under section 1782, which it used to identify and bring suit against infringers in cases in the United States and abroad. The referenced cases are:

a.    *Nagravision SA v. Zhuhai Gotech Intelligent Technology Co.*, No. 4:15-cv-00403 (S.D. Tex.) and *Nagravision SA v. Envoyer S.L.*, No. 4:17-cv-02227 (S.D. Tex.), which were brought as "John Doe" actions against IKS service operators and Nagravision identified the defendants from information obtained by subpoena, including subpoenas to Sharktech where it produced information analogous to what Nagravision is seeking to obtain from Sharktech in this application. The relevant pleadings authorizing discovery in the two cases are attached as Exhibits 5-6.

b.    *In re Application of Nagravision SA*, No. 1:21-cv-00115 (N.D. Ill.), *In re Application*

*of Nagravision SA*, No. 2:21-mc-0015-HCN-CMR (D. Utah), and *In re Application of Nagravision SA*, No. 2:16-mc-0111-RSL (W.D. Wash.), where courts granted Nagrvision's applications to obtain equivalent discovery from server hosts similar to Sharktech under 28 U.S.C. § 1782. The relevant pleadings in the three cases are attached as Exhibits 7-9. Nagravision used the information obtained through these 1782 applications to support legal actions brought outside the United States, including a criminal referral to authorities in Korea regarding a manufacturer of unauthorized receivers where charges were filed and the case remains pending.

15. Like in these previous cases, through this application Nagravision seeks discovery to identify the customer that is circumventing Nagravision's security technology using a server that is hosted by a United States-based company, in this case Sharktech. Nagravision's proposed order identifies the information that it wishes to obtain from Sharktech.[1] Items 1-3 are an account profile or other document identifying the customer's name, contact information, and IP address, along with any account applications and statements. The foregoing is relevant for purposes of identifying the customer responsible for the Sharktech Server. However, based upon Nagravision's experiences in similar cases, this basic account information will likely be fabricated and, standing alone, inadequate to properly identify the Sharktech customer.

16. There have been several instances over the past years where Nagravision obtained authorization from a court to discover from a service provider the name and contact information of a customer responsible for a server used as part of an IKS service, and the information provided by the service provider in response to the order was fabricated and did not correspond with a real person. For example, Nagravision was granted a disclosure order from the Paris Judicial Court requiring a service provider to disclose information regarding a customer involved in an IKS server operation. The account records produced by the service provider showed the customer as having the first name "Frank" and the last name "Stein" – an apparent reference to the fictional character, Frankenstein. The street address of record for this "Frank Stein" was not a valid address. The email address and telephone number in the service provider's account records also did not correspond with the real

---

[1]Nagravision's proposed subpoena is attached as Exhibit 10 and directs Sharktech to produce the discovery items identified in the proposed order granting this application.

customer. This is one example of a pay-television pirate giving their service provider a false name and contact information to hide their true identity.

17. Nagravision must obtain information from Sharktech that extends beyond the basic customer information and which cannot be so easily faked. Billing information is an example. Item 4 in the proposed order is the financial account or other source of funds the customer used to pay Sharktech. With this information, Nagravision will be able to request discovery from that financial institution and obtain the name and contact information of the account holders paying Sharktech for the Sharktech Server. The billing information may also show that more than one person is involved in operating or otherwise responsible for the Sharktech Server.

18. Similarly, Item 5 in the proposed order is communications involving the Sharktech customer, such as account set-up correspondence and support tickets. The customer responsible for the Sharktech Server, even if false account information was provided, may inadvertently identify themself in these communications with Sharktech. The communications may also show there is more than one person involved in operating or otherwise responsible for the Sharktech Server.

19. Separately, the communications in Item 5 are relevant if the customer that is assigned the Sharktech Server is a reseller, meaning the reseller's customer is probably the person that is using the Sharktech Server to circumvent Nagravision's security technology. As an example, in the *Zhuhai Gotech* case referenced above, Nagravision received account records and payment records from a service provider in the United States in response to a subpoena showing the IKS server was assigned to a reseller in China. The customer support tickets produced in response to that subpoena, however, had information identifying the Chinese reseller's customer. Nagravision amended the "John Doe" complaint and named that customer as a defendant.

20. Item 6 of the proposed order is a full electronic image of the Sharktech Server. The server images are expected to include logged IP addresses that accessed the Sharktech Server. In the IP address logs, Nagravision expects to find instances where the operator of the Sharktech Server, marked by their own IP address, accessed the server to install or upgrade server software, manage the administration console, or otherwise maintain the server. By conducting discovery on the service provider that assigned the IP address, Nagravision may be able to identify the persons operating the

Sharktech Server by name. The logged IP addresses are similar to the payment records addressed above in that the responsible Sharktech customer is less likely to falsify this information.

21.    The server image in Item 6 is also relevant if the Sharktech Server is assigned to a reseller. For example, in *Zhuhai Gotech*, the server images produced by the service provider allowed Nagravision to identify control word sharing software running on the IKS server. Certain software files were configured such that an alert message was sent to specified email addresses in the event the IKS server malfunctioned. The email addresses corresponded with employees of the defendants that were later named in that case. The foregoing further shows the relevance of the server images for purposes of identifying the customer responsible for the Sharktech Server.

22.    Finally, Item 7 of the proposed order is that Sharktech produce connection traffic to and from the Sharktech Server for a limited period of time not to exceed 48 hours. Nagravision seeks this connection traffic because it has experienced cases where data on an IKS server was encrypted by the server operator to block attempts to access their information, such that real-time analysis of the servers was the only way to obtain the requested material.

23.    Nagravision, as an example, was granted an order from the High Court of Chancery, United Kingdom, requiring that a service provider produce information on its customers involved in an IKS server operation. The service provider produced to Nagravision a virtual machine which emulated the servers. Nagravision discovered that the control word sharing software was stored in and ran from a file that the customer encrypted and disguised as a Microsoft Windows system file. The encryption prevented Nagravision from analyzing the data in the file, which if available may have assisted Nagravision in identifying the responsible customer. If data on the Sharktech Server is encrypted, the server images will be inadequate and instead Nagravision must review connection traffic captured while the Sharktech Server is active in order to discover the IP address used by the responsible customer when managing the Sharktech Server.

24.    Connection traffic is also required to identify the source of the Nagravision control words being transmitted through the Sharktech Server. The Sharktech Server is believed to receive the control words from additional servers connected to smart cards that are activated on subscription accounts created with Nagravision's customer, Canal+. To date, Nagravision has not been able to

identify the servers from which these control words originate. The connection traffic in Item 7 will enable Nagravision to identify the source of the control words passing through the Sharktech Server and in turn conduct additional discovery to uncover the persons responsible for those servers.

25.    Nagravision is unaware of any proof-gathering restrictions applicable to cases filed in France that would prohibit the discovery sought in Nagravision's application. France's Code of Civil Procedure generally allows for pre-trial discovery in a civil proceeding.[2] Nagravision does not believe that a French court will reject any evidence obtained in this matter. The foregoing is based on Nagravision's experience litigating cases in France and consultation with its counsel in France.

**Nagravision's Evidence Preservation Concerns**

26.    There is a genuine risk that the person operating the Sharktech Server, if notified of Nagravision's application for discovery, will alter or delete information on the Sharktech Server or relocate their IKS services from the Sharktech Server to new servers, thus forcing Nagravision to restart its investigation and legal action anew.

27.    Nagravision, as an example, began conducting discovery on the service providers in *Zhuhai Gotech* and not long after the IKS service moved to servers different from those Nagravision identified in its pre-filing investigation. Similarly, Nagravision obtained three *Norwich* orders from the Superior Court in Montreal, Canada directed at a service provider in Canada that was hosting IKS servers. The *Norwich* orders required the service provider to produce information similar to that requested in this matter and to shut down the IKS servers distributing Nagravision's control words. Shortly after obtaining the *Norwich* orders, several unauthorized receivers using the servers of the Canadian service provider transitioned to new servers in the United States to obtain Nagravision's control words.

28.    Nagravision, in another example, requested cooperation from a service provider in the United States called SoftLayer Technologies, Inc. with respect to an IKS service making use of its infrastructure and services. In a matter of days, that IKS service transitioned to new servers hosted by a different provider in the Netherlands. Nagravision had a similar experience when attempting to take action against the IKS service known as Pinwheel. Nagravision requested assistance from two

---

[2]https://www.legifrance.gouv.fr/codes/article_lc/LEGIARTI000006410268/1976-01-01.

separate service providers in France and Romania and in response the IKS service was relocated to servers hosted by a different service provider in Belize. Nagravision confronted similar challenges when requesting cooperation from service providers in the United Kingdom whose servers were used to provide Nagravision's control words to unauthorized receivers: in response the IKS server operators moved their services to a new service provider located in Sweden.

29.    Nagravision's experiences pursuing pay-television pirates are consistent with those of its United States affiliate, NagraStar LLC, which has been a party in several cases where the court observed that pay-television pirates are predisposed to destroy or hide evidence of their wrongdoing when confronted with legal action, including:

a.    *DISH Network L.L.C. v. Howard*, No. 13-cv-01136 (N.D. Ind.), where the court granted an ex parte seizure and noted that "pirates are often the type of defendant who would destroy or hide evidence when provided notice of the claims against them");

b.    *DISH Network L.L.C. v. Carillo*, No. 09-cv-01428 (D. Conn.), where the court observed that "telecommunications pirates are the types of defendants who would violate court orders" and granted ex parte relief "to address the risk that evidence of illegal activity will be destroyed if the defendants are given immediate notice");

c.    *DISH Network L.L.C. v. Hipps*, No. 08-cv-00357 (W.D.N.C.), where the court authorized the case to go forward against defendant without notice and commented on "the well-known tendency of alleged pirates to vanish with key evidence as soon as they get wind of impending legal action").

The relevant pleadings in these three cases are attached as <u>Exhibits 11-13</u>.

30.    If history repeats itself, the customer responsible for the Sharktech Server will stop using the server and relocate the IKS service to new servers once receiving notice from Sharktech in this case. The relocation of the IKS service to new servers presents a serious threat of irreparable harm to Nagravision as certain information requested in this application will no longer be available. Nagravision will be unable to obtain connection traffic for the Sharktech Server, which as explained above is an important source of information for purposes of identifying the IP address used by the Sharktech customer and the servers from which Nagravision's control words originate.

31. Sharktech's customer may also alter or delete information on the Sharktech Server, including logged IP addresses and control word sharing software running on these servers, which is valuable for the purpose of identifying the responsible customer. In addition, the Sharktech customer may destroy evidence required for the merits of Nagravision's claim, such as control word sharing software on the Sharktech Server and information concerning the number of end users that obtained Nagravision's control words from that server, which may be relevant for quantifying damages.

32. Accordingly, Nagravision proposes a three step discovery process where Sharktech (1) first preserves the information requested in this application, (2) next notifies its customer that is responsible for the Sharktech Server and each have an opportunity to object or seek protection; and (3) Sharktech produces the information to Nagravision only after any objections have been resolved. Nagravision believes this strikes the appropriate balance between preserving the necessary evidence and providing both Sharktech and its customer the ability to be heard. The same approach was used in the earlier cases referenced above where Nagravision was granted relief under 28 U.S.C. § 1782.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 21, 2026.

Pascal Metral

10